UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | Case No. 1:13-cr-35 |
| v. | ) | |
| | ) | *Collier/ Lee* |
| | ) | |
| MICHAEL MADDOX | ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to suppress and memorandum filed by Defendant Michael Maddox ("Defendant") in an effort to suppress all evidence resulting from a traffic stop on October 5, 2011 [Doc. 14]. Defendant alleges the search of his vehicle was unconstitutional because the police lacked reasonable suspicion to justify extending the not-yet-completed traffic stop with unrelated questioning and a drug-detection dog sniff.[1] After fully considering the evidence and arguments, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.[2]

**I.    FACTS**

At the hearing on the motion to suppress, the government offered the testimony of Tennessee Highway Patrol ("THP") Trooper George Stephens ("Stephens"), the sole witness to testify. Stephens testified as follows.

Stephens works in a canine unit assigned to the THP's Highway Interdiction Team. He has

---

[1] Originally, Defendant also challenged the reliability of the drug-detection dog deployed during the traffic stop. After records about the training and reliability of the dog were provided to Defendant by the government, Defendant withdrew his challenges to the reliability of the dog [Doc. 23]. Thus, I **FIND** the dog's "sniff is up to snuff." *See Florida v. Harris*, 568 U.S. __, 133 S.Ct. 1050, 1058 (2013).

[2] By standing order, the motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b). An evidentiary hearing on the motion was held on August 28, 2013, and the parties timely filed post-hearing briefs [Docs. 25 & 26], which have been fully considered.

16 years of law enforcement experience with the last six years at the THP. He has been trained specifically for interdiction, including what to consider as both verbal and non-verbal suspicious behavior during a traffic stop. He is also trained and certified to work with his assigned drug-detection dog, Zoey.

On October 5, 2011, Stephens was on patrol with Zoey. Around noon, he stopped a vehicle driven by Defendant for speeding (65 mph in a 55 mph zone) on I-24 in Marion County, Tennessee. The stop, for the most part, was captured on Stephens's patrol car dash-mounted video equipment and the audio equipment worn on his belt. While conclusions to be drawn from the events of the stop are in dispute, the events themselves, with the exception of when Stephens received information back from his dispatch, are largely undisputed. Most of the events are captured on video or audio recordings from the stop and the recorded evidence was entered as the sole exhibit to the hearing, Exhibit 1.

Construing Stephens's testimony and Exhibit 1 together, the following events occurred as timed based on the lapsed time from the start of the recording:

| Min./Sec. Into Stop | Events |
| --- | --- |
| 00:51 | Speeding stop initiated. Defendant promptly and properly pulled over. Stephens called tag into the THP dispatch. |

| 01:18 to 4:30 | Stephens approached vehicle and spoke with Defendant to obtain his license, insurance and registration information. Defendant advised he had a gun in his vehicle in the driver door panel and produced his carry permit. Defendant admitted he was speeding. Stephens questioned Defendant about where he was coming from, and Defendant says he was on vacation the last three days, but went "no particular place" and was now headed back to his home in Kentucky.<br><br>Stephens testified he thought it strange there was no visible luggage in the vehicle; he saw only a Walmart bag and a cooler. He found Defendant's travel plans suspiciously vague. However, Defendant did not seem anxious. Stephens assumed the gun was loaded, which heightened his awareness even though Defendant had a carry permit. |
|---|---|
| 04:35 | Stephens returned to his patrol car to review Defendant's documentation. He typed Defendant's information into his patrol car computer in order to check Defendant's driver's license. |
| 06:25 to 07:56 | Because he was suspicious, and because policy prohibits Stephens from conducting a search without backup for officer safety reasons, Stephens made a cell phone call to the Monteagle Police Department ("MPD") to request backup. He told MPD dispatch he planned to ask for consent to perform a vehicle search. |
| 07:56 to 09:08 | Stephens testified that he believed he may have gotten back information regarding his check of Defendant's driver's license around this time, but he could not be certain since the stop was a year prior to his testimony. He stated that getting the driver's license information back was not the end of his records check. He could not specifically recall when he got the information back, and he stated that the typical time for the return of such information may vary from a few minutes to longer based on various computer system issues. |
| 09:08 | **\*\*Defendant contends the stop should have concluded at this point as Stephens had information about Defendant's license back from dispatch by this time.\*\***<br><br>Stephens returned to vehicle and asked Defendant to exit vehicle. Stephens testified he did so to separate Defendant from the gun, which Defendant had previously disclosed was in the door panel. Stephens admitted he did not feel any particular threat from Defendant related to the gun; separation was just in accord with his training. |

| 09:48 to 10:00 | Stephens engaged in a consensual patdown of Defendant and verified information from Defendant's license and registration. Defendant was told to stand by the passenger window of the patrol car, but he was not restrained. Stephens told Defendant his computer was running slow. |
|---|---|
| 10:19 to 11:17 | Stephens informed Defendant that he was trying to get computer information on his "record." Stephens told Defendant that depending on what Defendant's records check revealed, he could be issued a warning citation, or a regular citation. Stephens asked Defendant if he had any tickets, and Stephens told Defendant that he had not gotten his record back yet. Defendant said it had been 20 years since he had gotten a ticket.<br><br>Stephens asked additional questions about Defendant's travel, stating, "So you've been on vacation, huh?" Defendant replied he and "his woman got into it" and "I'm just out." Defendant reported his "woman" lived with him, so he left for three days, going no particular place. Defendant confirmed he had no luggage with him, stating he had left without it. Stephens asked about drugs, currency or illegal items in car; Defendant denied having same.<br><br>Stephens testified he found this behavior odd. Stephens testified Defendant began acting somewhat irritated about being asked about his travel plans again. |
| 11:22 to 12:19 | Sergeant Dennis Womack ("Womack") of MPD arrived to assist Stephens.<br><br>Stephens told Defendant he was still waiting on computer information. Stephens asked for consent to search the car (twice) and Defendant denied same. When asked why not, Defendant said he was shot and robbed two years prior, and since then the law had unfairly treated him like a criminal who had done something wrong. Stephens again told Defendant he was "waiting on your information" and "when your stuff comes back" he would let Defendant know if he was going to get a warning or citation.<br><br>Defendant's comment about being shot and his demeanor when answering the questions made Stephens suspicious Defendant might have a criminal record. |
| 12:29 | Stephens asked Defendant to stand by the front bumper of the patrol car. |

4

| 12:34 to 13:13 | Stephens spoke to Womack about the speeding stop, saying that he was going to deploy Zoey, that he was still waiting on computer information, and that there was a gun in car. |
|---|---|
| 13:25 to 15:54 | Stephens called the El Paso Intelligence Center ("EPIC") to obtain a criminal record/warrant check about Defendant. Stephens said Defendant's "travel plans are the only thing that drew my suspicions to him." Stephens admitted he was not required to run full criminal history to issue a speeding ticket. |
| 15:53 | Stephens told Defendant he was going to deploy his dog while waiting for information. |
| 17:05[3] | Stephens deployed Zoey. |
| 17:22 | Zoey alerted. |
| 18:20 | As Stephens explained the alert to Defendant, Stephens's cell phone rang. He received a call to confirm whether Womack had arrived for backup. |
| 25:20 to 25:36 | Stephens received requested information from EPIC. Defendant had no prior criminal record. At some point after the EPIC information was returned, Defendant was issued a citation for speeding and was arrested on drug charges. |

During the car search, law enforcement found a distribution amount of methamphetamine, a loaded firearm, a loaded magazine, a glass pipe, a torch, and $2,210 in cash. After Defendant's arrest, he made incriminating statements. A two-count Indictment charges that on October 5, 2011, the day of the traffic stop, Defendant (1) possessed 50 grams or more of methamphetamine with

---

[3] Assuming it would take the exact same time to receive information from EPIC regardless of when the request was made during the stop, i.e., 12 minutes and five seconds later, Defendant contends Stephens would have received the requested information back from EPIC by 16:55 minutes into the stop if Stephens had timely requested the records check when he first returned to his patrol car. Defendant argues that if Stephens had received the information back by 16:55 minutes into the stop, then Stephens would have had to decide whether to issue a warning or citation for speeding and would have had to release Defendant before Zoey's deployment, which was ten seconds later at 17:05. This argument does not take into account any time it would have taken Stephens to actually write and give any citation or warning to Defendant.

5

intent to distribute it and (2) carried and used a firearm in relation to that drug trafficking offense [Doc. 3]. Defendant now seeks to suppress all of the evidence found during the search as well as his incriminating statements.

## II. ANALYSIS

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV.[4] Within the meaning of the Fourth Amendment, an ordinary traffic stop is considered an investigative detention governed by the principles established in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Under *Terry*, this Court must determine whether the stop was "justified at its inception," and then "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20. Stopping a motorist is a seizure of all occupants of the vehicle under the Fourth Amendment. *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012). Ultimately, "[i]t is the [government's] burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

Defendant does not challenge the legality of the stop. Instead, he challenges the duration of the stop, which lasted about 17 minutes from initiation of the stop until Zoey's alert or, as the government argues, about 16 minutes from when Stephens made direct contact with Defendant until Zoey's alert. Defendant's motion to suppress hinges on two issues: (1) was the purpose of the stop completed prior to the deployment of Zoey; and, if not, (2) was the yet-to-be-completed traffic stop

---

[4] The government does not dispute that Defendant had a reasonable expectation of privacy under the Fourth Amendment to challenge the search in this case.

unreasonably and measurably extended beyond the time necessary to conclude the stop. Although separate issues, they are somewhat intertwined and will be addressed together.

As the Supreme Court held in *Arizona v. Johnson*,

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

555 U.S. 323, 333 (2009) (internal citations omitted). And, as often reiterated by the Sixth Circuit,

> A valid *Terry* stop must be "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010). To be limited in scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. To be limited in duration, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id*.

*E.g., United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012).[5] "[T]he proper inquiry is whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole* — including any prolongation due to suspicionless unrelated questioning — was reasonable." *Everett*, 601 F.3d at 494 (emphasis in original) (internal citations omitted).

---

[5] Alternatively, the police may extend a stop beyond the scope of what was originally permissible if "something happened during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) (internal quotation marks and alterations omitted). "[W]ithout such reasonable suspicion, all the officer's actions must be 'reasonably related in scope to circumstances justifying the original interference.'" *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (quoting *Hill*, 195 F.3d at 264). Given my conclusions herein, I do not reach this issue.

7

First, it is not seriously contended by Defendant that the stop was *actually* concluded prior to Zoey's alert as Stephens had not yet written or given Defendant a ticket or warning for the speeding violation. Although not argued by the parties, it also appears from the video that Stephens had not yet returned Defendant's license and registration to him at any time before Zoey's alert. Thus, I **FIND** the traffic stop had not been completed before Zoey's deployment and alert. Second, after the hearing Defendant clarified his argument and now appears to be arguing that Stephens unreasonably delayed the not-yet-completed stop for at least seven minutes by asking questions about matters unrelated to the speeding violation and by deploying Zoey [Doc. 25]. In response, the government chiefly contends Zoey was properly deployed while Stephens was waiting for information from EPIC in order to complete the traffic stop and, thus, Stephens did not measurably or unreasonably delay the not-yet-completed stop [Doc. 26].

The heart of the parties' dispute centers on when the purpose of the stop, ostensibly made to investigate a speeding violation, should have been concluded. Defendant's initial position seemed to be that Stephens should have requested information from EPIC earlier in the stop, and that if he had properly requested the records check from EPIC at 4:50 minutes into the stop, then the information would have been available to Stephens by 16:55 minutes into the stop, which was about ten seconds before the time Stephens deployed Zoey.[6] In response to this argument, the government noted that any such "delay" was at most thirty seconds because Zoey alerted to the odor of controlled substances about 17 seconds after deployment, thus providing probable cause for the ensuing warrantless search.

---

[6] It is undisputed that Stephens requested the records check from EPIC at 13:25 minutes into the stop and received information back from EPIC some 12 minutes and five seconds later at 25:30, which was after the alert by Zoey.

8

Defendant now appears to mainly contend the stop should have been concluded around eight minutes into the stop. Somewhat refining his position post-hearing, Defendant argues the stop should have been completed after about eight to nine minutes, which was when Stephens testified that he received license information back from dispatch. The government's post-hearing submission indicates no recall of such testimony. Both parties' arguments, which were made without the benefit of a transcript, are a little off the mark. Stephens credibly testified that he believed he may have gotten back information from dispatch regarding his check of Defendant's driver's license around the eight to nine minute mark, but he could not be certain since the stop was a year prior to his testimony. Given that the government bears the burden of proof, however, I **FIND** Stephens received Defendant's driver's license information from dispatch around the eight to nine minute mark, as he thought he might have. This finding, however, does not end the inquiry because Stephens credibly testified that getting the driver's license information back was not the end of his records check. The recorded evidence supports that Stephens was expecting additional information from dispatch as Stephens can be heard telling Defendant, Womack, or himself at various times that he is waiting for additional information. In any event, Stephens did not complete the stop at the nine minute mark, he instead decided to ask a few more questions and after that he decided to run an additional records check through EPIC.

Defendant focuses on delay resulting from Stephens's questioning, and it appears Stephens's decision to request records from EPIC also resulted in a lapse of time, so these issues will be addressed together. Of course, the overarching inquiry is one of reasonableness. *Everett*, 601 F.3d at 493-94. To evaluate the reasonableness of the prolongation of a stop, a court considers the diligence of the officer with an eye towards both the duration of the officer's extraneous questioning

9

and the subject matter of the questions. *Id.* at 494. With respect to subject matter, questions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer are "context-framing" or officer safety questions that "do not bespeak of a lack of diligence." *Id.* 494-95.

"It is well-settled that 'an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation.'" *United States v. Campbell*, 511 F. App'x 424, 427 (6th Cir. 2013) (quoting *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999)). Although not fully explained during the hearing, "EPIC provides information on drivers' licenses, car registrations, and whether an individual has crossed the border at a checkpoint, was deported, or is under federal investigation." *United States v. Urrieta*, 520 F.3d 569, 571 (6th Cir. 2008). During a routine traffic stop, it is permissible for an officer to conduct record checks with law enforcement databases that provide more information than the typical police dispatch such as EPIC or the Blue Lightning Operations Center ("BLOC"). *See e.g., Campbell*, 511 F. App'x at 425 (BLOC inquiry was proper record check); *Urrieta*, 520 F.3d at 571 (response from EPIC check, which took 11 minutes to conclude, denoted a conclusion of the traffic stop); *United States v. Walton*, 258 F. App'x 753, 755, 757 (6th Cir. 2007) (negative response from BLOC inquiry used to define endpoint for permissible duration of traffic stop). Defendant has provided no authority to suggest that reasonable suspicion must be formed during a traffic stop to warrant a police request for information from databases such as EPIC, and I am aware of no such authority.

Addressing the question of a not-yet-completed stop, as is the case here, the Sixth Circuit has held, "[b]ecause a crafty officer . . . may simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her hunches were unfounded, we also treat the unreasonable extension of a not-yet-completed traffic stop as a seizure." *United States v. Stepp*, 680

F.3d 651, 662 (6th Cir. 2012) (citations omitted). As a result, an officer may not unreasonably abandon or delay writing a ticket, citation, or warning in order to propound questions to motorists and their passengers. *See Stepp*, 680 F.3d at 662.[7] A court "must conduct a fact-bound, context-dependent inquiry in each case" to determine whether the "'totality of the circumstances surrounding the stop' indicates that the duration of the stop as a whole — including any prolongation due to suspicionless unrelated questioning — was reasonable." *Everett*, 601 F.3d at 493-94 (citations omitted). An officer's "subjective intent or hope to uncover unrelated criminal conduct" through such questioning "is irrelevant." *Id.* at 495 n. 12 (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). The key inquiry is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id.* at 494 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). If the officer is not diligent and unreasonably extends the stop with extraneous questioning, there must be reasonable suspicion to warrant the prolongation. *See Stepp*, 680 F.3d at 663-64; *Townsend*, 305 F.3d at 541.

Stephens's questions to Defendant about his travel plans were of the context-framing type deemed reasonable in cases such as *Everett* and *Stepp*. There is nothing about the subject matter of the questions to Defendant to suggest a lack of diligence on Stephens part in conducting the traffic

---

[7] In *Stepp*, the Sixth Circuit cited to *Everett* as creating a bright-line rule that any extraneous questioning that prolonged a stop was an unreasonable extension even if it was de minimis. 680 F.3d at 662 (citing *Everett* for the proposition that "[w]hen the initial stop has concluded, we have adopted a bright-line rule that any subsequent prolonging, even de minimis, is an unreasonable extension of an otherwise lawful stop."). *Everett*, however, instead crafted an inquiry to determine the reasonableness of the entire stop by analyzing the totality of the officer's conduct. The *Stepp* court held an unreasonable extension of a not-yet-completed traffic stop may occur in as little as six minutes of extraneous questioning. *Id.* at 661-63 (finding six minutes of extraneous questioning unreasonably prolonged a traffic stop). Yet, the *Stepp* court also found "[a] traffic stop is not 'measurably' extended by extraneous questioning even when such questioning undeniably prolongs the stop to a minimal degree." *Id.* at 662.

11

stop. Likewise, requesting a records check from EPIC does not indicate a lack of diligence. Therefore, I **FIND** Stephens did not unreasonably extend the not-yet-completed stop under the totality of the circumstances. Instead, I **FIND** Stephens's overall course of action during the stop, viewed objectively and in its totality, was reasonably directed toward the proper ends of the stop and did not result in an unreasonable extension of the not-yet-completed traffic stop.

Before the stop was completed and while waiting for the EPIC records check so he could decide whether to write a citation or a warning for speeding, Stephens deployed Zoey. Such a dog sniff does not require separate reasonable suspicion because it is not a search under the Fourth Amendment. *See Stepp*, 680 F.3d at 663 (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005); *United States v. Bell*, 555 F.3d 535, 541-42 (6th Cir. 2009) (a slight deviation from the initial purpose of traffic stop to call for and deploy a drug-detection dog around vehicle would not require separate reasonable suspicion). I **FIND** Zoey, who was readily available in the patrol car, was deployed prior to the conclusion of a proper and not-unduly-extended traffic stop. An alert by a properly trained and reliable drug dog "'is sufficient to establish probable cause for the presence of a controlled substance.'" *United States v. Howard*, 621 F.3d 433, 453 (6th Cir. 2010) (quoting *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994)); *accord United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012).[8]

---

[8] Given the above findings and conclusions, it is not necessary to address whether Stephens had a reasonable and articulable suspicion sufficient to justify an extended detention under the totality of the circumstances presented. Likewise, it is not necessary to address the government's alternative arguments under *Herring v. United States*, 555 U.S. 135 (2009) and *Davis v. United States*, 131 S.Ct. 2419 (2011).

12

**III. CONCLUSION**

For the reasons stated above, I **RECOMMEND** that Defendant's motion to suppress [Doc. 14] be **DENIED**.[9]

                                                                            s/ *Susan K. Lee*
                                                                            SUSAN K. LEE
                                                                            UNITED STATES MAGISTRATE JUDGE

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).